# United States District Court
## Western District of Virginia
### Harrisonburg Division

|  |  |  |
|---|---|---|
| **DONNA DENISE GRIFFITH,** | ) ) ) ) | Civil No.: 5:13cv00090 |
| *Plaintiff,* | ) ) | |
| v. | ) ) | REPORT AND RECOMMENDATION |
| **CAROLYN W. COLVIN**, Acting Commissioner of the Social Security Administration | ) ) ) ) | |
|  | ) | By: Hon. James G. Welsh |
| *Defendant* | ) ) | U. S. Magistrate Judge |

      Donna Denise Griffith brings this civil action (docket #3) challenging a final decision of the Commissioner of the Social Security Administration ("the agency") denying her applications for a period of disability and disability insurance benefits ("DIB") and for supplemental security income ("SSI") under Titles II and XVI respectively of the Social Security Act, as amended ("the Act") 42 U.S.C. §§ 416 and 423 and 42 U.S.C. §§ 1381 *et seq*. respectively. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g).

      Along with the Commissioner's Answer (docket #6), she filed a certified copy of the Administrative Record ("R.") (Docket #7) which includes the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. Each party seeks summary judgment (docket #11 and #15) and each has filed a supporting memorandum of points and authorities (docket #13, #16 and #17). Oral argument was not requested (docket #13), and by standing order this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I. ADMINISTRATIVE AND PROCEDURAL HISTORY

In her applications [1] Ms. Griffith alleged a disability onset date of February 1, 2008 [2] due to a bipolar/mood disorder (R. 35, 211-212). Her claims were denied initially, on reconsideration, and again by written decision of an administrative law judge ("ALJ") dated October 29, 2010 following an administrative hearing (R.11-21, 71-81, 82-92, 93, 94, 95-104, 105-114, 115, 116, 117-122).

Based on his consideration "of the entire record," in the ALJ's written decision he made the following findings of fact and conclusions of law: (1) Ms. meets the insured status requirements of the Act through December 31, 2013; (2) she has not engaged in substantial gainful activity since her amended onset date; (3) her *severe* [3] impairments include a bipolar/mood disorder with anxiety and depression, a personality disorder, obesity, left ear deafness, and a polysubstance abuse history (in 5-year remission); (4) she has no impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, appx. 1; (5) she has the residual functional capacity to perform a full range of work at all exertional levels, but she cannot engage in work requiring stereoscopic hearing, requiring more than occasional interaction with peers or the public or supervisors, and assembly-type production work; (6) with these functional limitations; the ALJ concluded Ms. retains the functional ability to perform her past relevant jobs as a dishwasher and as a housekeeper; and (7)

---

[1] The plaintiff protectively filed both her DIB and SSI applications on March 10, 2009 (R. 11, 173-176, 177-179).

[2] During the administrative hearing, the plaintiff's onset date was amended to October 13, 2008 (R. 37-38).

[3] Quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'" *See also* 20 C.F.R. § 404.1520(c).

therefore, she is not under a disability [4] between her amended onset date and the date of the ALJ's decision (R. 13-20).

Following the ALJ's October 29, 2010 issuance of his adverse hearing decision, the plaintiff filed for Appeals Council review contending the ALJ erred in failing to analyze her condition on a longitudinal basis and a failure to conclude her condition met or medically equaled a listed impairment (R. 275-279). Her request was denied on January 31, 2011(R.1-5), and she filed for court review. *Griffith v. Astrue,* (WDVA case 5:11cv00011, docket #2). In her brief, the plaintiff's sole argument was that the ALJ had selectively chosen the evidence he considered and thereby failed to evaluate her mental impairments on a longitudinal basis (R. 582); *Griffith v. Astrue,* (5:11cv00011, docket #13, pp 11-20). The district court agreed, and remanded the case for further consideration under sentence Four of 42 U.S.C. § 405(g) (R. 598-599, 600-607).

On remand the October 2010 ALJ decision was vacated by the Appeals Counsel, and the plaintiff was afforded the opportunity for a further hearing, which was regularly scheduled and held on January 23, 2013 (R. 523-524, 543-597, 610, 619-633-639, 651, 684). On January 25, 2013 the ALJ issued a new written decision denying the plaintiff's claims (R. 523-537).

Therein, the ALJ made the following findings: (1) Ms. 's insured status continued through December 31, 2013; (2) she had not engaged in substantial work activity since her amended disability onset date of October 13, 2008; (3) her *severe* impairments included complete loss of hearing in her left ear, a mood/ bipolar disorder, a personality disorder with anxiety and depression and a polysubstance abuse history (then in 7-year remission); (4) she has

---

[4] A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 423(d)(1)(A).

no impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, appx. 1; (5) she has the residual functional capacity to perform a full range of work at all exertional levels, but she cannot engage in assembly-type production work, work requiring stereoscopic hearing, or work requiring more than occasional interaction with peers, the public and supervisors; (6) with these functional limitations Ms. Griffith retains the functional ability to perform her past relevant job as a dishwasher; and (7) therefore, she is not under a disability between her amended onset date and the date of the ALJ's decision (January 25, 2013). (R. 527-536).

As a part of his reconsideration of the plaintiff's applications the ALJ conducted a new review of the entire record. This included consideration of all of the plaintiff's symptoms and the extent to which they could reasonably be accepted as consistent with the objective medical and other evidence (R. 528). *See* 20 C.F.R. § 404.1529(a)-(c); § 416.929(a)-(c). He considered her obesity in conjunction with her other *severe* conditions, including her complete loss of hearing in her left ear and her several mental impairments. To "rate the severity [of the plaintiff's] mental impairments at steps 2 and 3 of the [agency's] sequential evaluation process," the ALJ utilized the paragraph B criteria of the mental disorder listings (R. 527-528). Making reference to specific evidence in the record upon which he relied, including *inter alia* the scope of the plaintiff's daily activities, her ability to function independently, her "one to two episodes of decompensation of extended duration" and her four short term symptom exacerbation events in 2009 (episodes that quickly abated with medication and allowed her discharge after only three to four days),[5] the ALJ rated plaintiff's daily living restrictions as "no more than moderate, her social functioning difficulties as "moderate," and her difficulties with concentration, persistence

---

[5] As the ALJ noted, "it is possible that the claimant's close-in-time voluntary admissions in March and April 2009 and two in November 2009, taken together, constituter one or two [extended duration] episodes" (R. 528)

4

and pace also as "moderate" (R. 527-528). He further concluded the plaintiff's mental health issues imposed no other decisionally significant limitation and that the plaintiff's ability to function was not limited to the degree she alleged (R. 528, 533).

Addressing specifically the primary issue on remand — the need for a more in depth consideration of the plaintiff's longitudinal record of treatment — the ALJ also provided a comprehensive discussion and characterization of the evidence. This included the plaintiff's 2009 hospitalizations, her subsequent treatment history (including forty-three outpatient counseling sessions), the improvement in her symptoms, and her normal mental status examinations (R. 531-534).

Following issuance of this new ALJ decision, Ms. Griffith once again sought review of the hearing decision. Based on its review of the written record, the most recent hearing testimony and consideration of her exceptions, the Appeals Council "found no reason under [its] rules to assume jurisdiction" (R. 516-518). This action ensued.

## II. SUMMARY AND RECOMMENDATION

Based on a thorough review of the administrative record and for the reasons herein set forth, it is **RECOMMENDED** that the plaintiff's motion for summary judgment be **DENIED**, the Commissioner's motion for summary judgment be **GRANTED**, an appropriate final judgment be entered **AFFIRMING** the Commissioner's decision denying the plaintiff's DIB and SSI applications, and this matter be **DISMISSED** from the court's active docket.

## III. STANDARD OF REVIEW

The court's review in this case is limited to determining whether the factual findings of the Commissioner are supported by substantial evidence and whether they were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2$^d$ 514, 517 (4th Cir.

5

1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance" of the evidence. *Laws v. Celebrezze*, 368 F.2$^d$ 640, 642 (4th Cir. 1966). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays v. Sullivan*, 907 F.2$^d$ 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2$^d$ at 642). The court is "not at liberty to re-weigh the evidence … or substitute [its] judgment for that of the [ALJ]." *Johnson v. Barnhart*, 434 F.3$^d$ 650, 653 (4th Cir. 2005) (internal quotation marks omitted).

## IV. THE ADMINISTRATIVE RECORD

### *Age, Education and Vocational Experience*

At the time the plaintiff alleges her disability began (October 13, 2008), she was forty-three years of age [6] (R. 29, 43, 173, 177, 546). She attended school through the eleventh grade, and her past relevant work was as a dishwasher and as a housekeeper (R. 21, 31, 42, 202, 248, 550, 566-567). Work as a dishwasher is classified as unskilled and exertionally medium; work as a housekeeper is classified as unskilled and exertionally medium (R. 43, 584-585).

According to the plaintiff, she became unable to work due to an exacerbation of her mental health symptoms following her mother's death in 2008 (R. 560-562). She testified that she became unable to make rational decisions, unable to deal with stress, fearful of failure, and fearful in unfamiliar places (R. 559-560, 564, 574-575).

---

[6] At this age the plaintiff is classified as a "younger person," and pursuant to the agency's regulations age is generally considered not to affect seriously a younger person's ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.927(c).

6

*Medical History*

By history given in March 2009 the plaintiff reported that she "believes she was seen at Northwestern Community Services ("Northwestern") some 13 years ago or so for drinking and was not placed on medicine;" however, no relevant notes could be found in Northwestern's medical record system (R. 345). Thus, her medical records essentially begin with short-term psychiatric hospitalizations in March (R. 313-320) and April 2009 (R. 296-299) immediately preceding her filing for DIB and SSI in May 2009.

When she first sought treatment at Northwestern on referral from Hospice, Ms. Griffith reported long-standing problems with depression and alcoholism (3-years in recovery) (R. 339-344). In a mental status evaluation the following day, Andrew Meyer, D.O., reported normal mental status examination results, with the exception of depression related to the death of Ms. Griffith's mother (R. 346-348). Dr. Meyer diagnosed her condition to be a mood disorder with significant symptoms (GAF 45) [7] related to her bereavement (R. 346). Prozac and therapy were prescribed, and a follow-up appointment scheduled in three months (R. 348).

Five days later, however, the plaintiff was admitted to Winchester Medical Center ("WMC") with complaints of depression, feeling overwhelmed, and having suicidal thoughts (R. 313-317). She "responded quite well" to medication and therapy and was discharged on the fourth hospital day on a revised medication regime and with instructions to follow-up with her

---

[7] The GAF is a numeric scale ranging from zero to one hundred used by mental health clinicians to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), 32 (American Psychiatric Association, 1994). A specific GAF score represents a clinician's judgment of an individual's overall level of functioning; for example a GAF of 41 - 50 represents serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning); a GAF of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning), and a GAF of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning). *Id.*

therapist at Northwestern (R. 318-320). At discharge the plaintiff's overall level function was assessed to be 57 on the GAF scale (R. 318).

As a post-hospitalization medication evaluation, the plaintiff saw Dr. Mayer on March 16, 2009 (R. 349-350). She reported that her mood was "better," and she was feeling more "calmed down; her mental status examination was normal, and Dr. Meyer rated her level of functioning at 50 on the GAF scale (*Id*.).

One month later, Ms. Griffith returned to WMC with complaints of suicidal thoughts, depressive symptoms, and "just want[ing] to feel better" (R. 293-296). She was once again admitted to the hospital's psychiatric unit, treated conservatively, and discharged with "improved mood" (GAF 55-60) on the fourth hospital day with instructions to follow-up with her therapist at Northwestern (R. 296-299-299),

As a post-hospitalization medication evaluation, the plaintiff saw Dr. Mayer on April 30, 2009 (R. 353-355). She reported that her mood was "good," and she was "a lot better than [the] last time I was here" (R. 353). Her mental status examination was normal, and Dr. Meyer rated her level of functioning at 55 on the GAF scale (R. 353-354).

Five days later, the plaintiff for a third time sought treatment through the WMC emergency room for depression and suicidal thoughts (R. 281-291). The plaintiff's dosage of Zoloft was increased, and she was released without hospital admission with instructions to return in the event her symptoms worsened (R. 291). Referencing this third ER visit, when she saw Dr. Meyer two days later, Ms. Griffith told him that she "wasn't doing too hot the other day," but was feeling "somewhat better with the increased Zoloft dosage; consistent with his previous examinations, Dr. Meyer found her mental status to be normal, and he assessed her level of functioning to be 55 on the GAF scale (R. 356-358).

8

Between June 1 and September 2, 2009 the plaintiff saw Dr. Meyer or his nurse for medication management approximately eight additional times. Throughout this period she described her mood in positive or terms; she reported some sleep difficulty that was treated with Ambien, and she reported that her medications had been a "miracle" for her (R. 368-370, 371-374, 375-377, 378-381, 382, 383, 384-385, 386, 755-756, 757-757), In June, Dr. Meyer assessed her level of functioning to 60 on the GAF scale, and in September he rated her at 65 on the GAF scale (R. 369, 385).

On November 13, 2009, Ms. Griffith returned to the WMC emergency room complaining that she was "feel[ing] like I'm going crazy" and feeling unsafe outside the hospital (R. 464-468). She was admitted to the psychiatric ward for an anticipated three to five day stay. She was once again treated conservatively and discharged on the fourth hospital day with a GAF of 56 (R. 468-471). One week later (November 23, 2009), the plaintiff returned to the emergency room after having overdosed on multiple psychotropic medications, apparently due to bereavement and family-related issues (R.475-483, 436, 464). Consistent with her earlier mental health-related admissions, she responded well to conservative psychotherapy and was discharged on the fourth hospital day with a GAF score of 56 (R. 469-471). When seen by Dr. Meyer in the clinic the same day, Ms. Griffith described her mood as "not all right," and he rated her current level of functioning to be 55 on the GAF scale (R. 488-490).

Over the ensuing two and one half years (December 2009 through June 2012) Ms. Griffith continued to see Dr. Meyer on a regular basis for clinic evaluations and medication management (R. 485-487, 491-492, 513-515, 511-512, 509-510, 507-508, 505-506, 503-504, 744-745, 742-743, 740-741, 738-739, 736-737, 732-735, 729-730, 727-728, 725-726, 723-724, 721-722, 718-719, 716-717, 713-715, 711-712, 708-709, 706-707). Throughout this period Ms.

Griffith's mental status examinations were normal; Dr. Meyer rated her level of functioning at 55 on the GAF scale, and the plaintiff generally described her mood as "good" or "alright" or "okay.

### *Counseling*

Beginning in January 2011 the plaintiff began a series of counseling sessions to help her deal with depression, anxiety, stress and related mental health issues (R.703-705). Following forty-three sessions, she was discharged from the program at the end of March 2012 after "achieving significant progress toward meeting her treatment goals," including a decrease in both her depression and anxiety symptoms (R. 700-702).

### *Consultive Mental Status Examination*

On February 16, 2012 Ms. Griffith was seen by Paul M. Hill, Psy.D., for a consultive evaluation "to assist in determining [the plaintiff's] eligibility for disability benefits" (R. 693-696). She gave a history that included childhood trauma, physical and verbal abuse both as a child and as an adult, significant difficulty in school, excessive use of alcohol and other drugs (5 years in remission), a bipolar diagnosis, and an intact ability to perform the basic activities of daily living (R.693-694). The examiner noted Ms. Griffith drove herself unaccompanied to the examination, made good eye contact, exhibited fluid speech, was appropriately groomed, presented as friendly and cooperative, and exhibited a somewhat depressed mood with an even affect (R.694). On examination, Dr. Hill found the plaintiff to be fully oriented, to have intact attention, to have difficulty with the serial sevens subtraction test, and to exhibit symptoms "consistent with a bipolar diagnosis" (*Id*.). He concluded the plaintiff's alcohol dependence to be in "full" remission, her substance abuse to be in "sustained" remission, her current GAF level of functioning to be 50-60, the prognosis for her mental health issues to be "guarded to fair," and her mental health impairments neither meet nor medically equal a listed impairment (*Id*.).

10

*State Agency Psychologist's Assessment*

On January 28, 2010 Sandra Francis, Psy.D., made an overall assessment of the administrative record and concluded Ms. Griffith was "moderately limited" in approximately twelve areas of mental functioning (R. 101-102), but in her opinion they "[did] not seriously interfere with [her] ability to think, communicate or interact with others," and she retained the capacity to perform simple, routine work in a non-stressful environment" (R. 102-104).

*Vocational Testimony*

Based an assumed individual with the plaintiff's vocational profile and restricted to work that was simple, routine, involved no independent decision-making, did not require stereoscopic hearing, involved only occasional interaction with peers or the public or supervisors, required no assembly line production work, and would miss work approximately eight days per year, the vocational witness testified that such a individual would be capable of performing the plaintiff's past relevant work as a dishwasher (R. 585-588).

*Misc. Lay-Testimony and Statements*

Ms. Griffith's administrative record also contains testimony or statements of several friends and acquaintances outlining their interaction with her and their observations about her functional limitations and difficulties (R. 688-691, 270-271, 272,273, 576-584). In one or more of these, the law-witness noted the plaintiff's past history of parental abuse, difficulty managing money responsibly, problems maintaining employment, anxiety and nervousness, problems sustaining conversations, and the exacerbation of her mental health problems following her mother's death. (*Id.*).

**V.     DISCUSSION**

On appeal, the plaintiff advances a single argument of ALJ error. It is her contention that the ALJ failed to assess her mental health issues in a longitudinal fashion given the fact that "one

11

of the characteristics of mental illness is the presence of occasional symptom-free periods." *See Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) (quoting *Poulen v. Bowen*, 817 F.2d 875, 885 (DDC Cir. 1987). (Dkt. #13 p 8). The absence of such a longitudinal review, the plaintiff argues, is evidenced by what she contends were the ALJ's trivialization of her multiple short-term psychiatric hospitalizations in 2009, the ALJ's "irrational" rejection of her lay-witnesses' anecdotal information about her day-to-day functioning, the ALJ's failure to recognize either the "superficial" nature of Dr. Meyer's mental status examinations or the fact that they were "done in the comfort and structured safety" of his office, the ALJ's failure to recognize that GAF scores are "hardly a fair measure" of her level of functioning and his failure to award benefits on the basis of certain "moderately limiting" functions identified by the state agency review and viewed to be disabling by the vocational witness (Dkt. #13, pp 8-21).

*Au contraire*, the record before the court more than amply demonstrates the ALJ's thorough review and examination of all of the available evidence as required by the regulations, including the objective medical evidence, the diagnoses and expert medical opinions, and the subjective evidence of the plaintiff and her lay-witnesses. *See Underwood v. Ribicoff*, 298 F.2d 850, 851 (4th Cir. 1962). He weighed the evidence and rationally concluded the plaintiff's brief hospitalizations in 2009 represented an atypical exacerbation of her symptoms, were of short duration and, as he also noted, were related bereavement issues at the time (R. 532, 534, 694). He appropriately concluded that the results of Dr. Meyer's regular mental status examination findings and stable GAF scores (dated from March 5, 2009 to June 7, 2012) were a fair longitudinal measure of the plaintiff's overall mental health and an accurate reflection of her generally moderate symptomology (R. 533-534). In making his determination that the plaintiff remained able to engage in substantial gainful activities, the ALJ also considered the lay-witness statements, including the hearing testimony of Joan St. John, and concluded this subjective

12

evidence of disability was not fully consistent with the medical record (R. 534-535). *See* 20 C.F.R. §§ 404.1513(d), 416.913(d); Social Security Ruling ("SSR") 06-03p, (explaining that the weight given an opinion from an "other source" is based on several factors, including *inter alia* "[h]ow consistent the opinion is with other evidence").

In her brief on appeal the plaintiff also suggests the ALJ erred by failing to award benefits on the basis of the certain areas of "moderate[] limit[tion]" [8] in functioning identified by a state agency psychologist and the vocational witness' "think[ing]" that "in combination [these limitations] would inhibit or render one unable to maintain employment." This opinion by the vocational witness was "specifically reject[ed] by the ALJ (R. 536). As he explained, in his opinion it did not accurately reflect the medical evidence as a whole (R, 536).

It is solely the responsibility of the ALJ to determine residual functional capacity at the hearing level. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c). He is not bound to accept, either in whole or in part, a residual functional capacity assessment of a claimant by a state agency medical or mental health source. 20 C.F.R. §§ 404.1527(e)-(f)(2)(i) and 416.927(e)-(f)(2)(i).

Instead, taking the evidence of record in total, the ALJ crafted an appropriate residual functional capacity finding. He took into account "all of the relevant medical and other evidence" and it reflected the "total limiting effects" of the plaintiff's impairments. 20 C.F.R. §§ 404.1545 and 416.945. Viewed as a whole, therefore, the record supports the ALJ's conclusion.

---

[8] These functional areas of moderate limitation include: the ability to understand and remember instructions; the ability to carry-out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or in proximity to others without being distracted by them; the ability to complete a normal workday and workweek without disruptions from psychologically based symptoms, *etc*.; the ability to interact appropriately with the general public; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to maintain social appropriate behavior *etc*.; and the ability to respond appropriately to changes in the work setting; (R. 100-102).

13

## VI. PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the undersigned submits the following formal findings, conclusions, and recommendations:

1. The factual findings of the Commissioner are supported by substantial evidence;

2. The factual findings of the Commissioner were reached through application of the correct legal standards;

3. Through the date of the ALJ decision (January 25, 2013): the plaintiff's severe impairments include: complete left ear hearing loss, mood disorder/bipolar disorder, personality disorder with anxiety and depression, and polysubstance abuse (in reported 7-year remission);

4. The plaintiff's meets the insured status requirements through December 31, 2013;

5. The plaintiff has not engaged in substantial gainful activity since her amended onset date (October 13, 2008);

6. The plaintiff does not have an impairment, or combination of impairments, that meets or medically equals one of the listed impairments in 20 CFR pt. 404, subpt. P, appx. 1;

7. The Commissioner's residual functional capacity determination is supported by substantial evidence;

8. Through the date of the ALJ decision, the plaintiff had the residual functional capacity to perform her past relevant work as a dishwasher;

9. The decision of the ALJ on remand is supported by substantial evidence;

10. Substantial evidence does not support the plaintiff's contention that the ALJ failed to make an appropriate "longitudinal review of her mental health records related materials in the administrative record:

11. The ALJ fully and fairly assessed the plaintiff's mental health issues in a longitudinal fashion;

12. There is no reason to believe that a remand of this case might lead to a different result, *See generally Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a [Social

Security] case in quest of a perfect opinion [from an ALJ] unless there is reason to believe that the remand might lead to a different result.");

13. The plaintiff has not met his burden of proving a disabling condition on or before the date of the ALJ's decision; and

14. The final decision of the Commissioner should be affirmed.

## VII. TRANSMITTAL OF THE RECORD

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

## VIII. NOTICE TO THE PARTIES

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.** Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

**DATED**: This 14th day of January 2015.

*s/ James G. Welsh*
United States Magistrate Judge