CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 1 6 2015

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

DONNA GRIFFITH,                    )
                                   )
        Plaintiff,                 )        Civil Action No. 5:13cv00090
                                   )
v.                                 )
                                   )
CAROLYN W. COLVIN,                 )        By:  Michael F. Urbanski
Commissioner of Social Security,   )             United States District Judge
                                   )
        Defendant.                 )

## MEMORANDUM OPINION

This social security disability appeal was referred to the Honorable James G. Welsh,

United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for proposed findings

of fact and a recommended disposition.  The magistrate judge filed a report and

recommendation on January 14, 2015, recommending that plaintiff's motion for summary

judgment be denied, the Commissioner's motion for summary judgment be granted and the

Commissioner's final decision be affirmed.  Plaintiff has filed objections to the report, the

Commissioner has responded, and this matter is now ripe for the court's consideration.

## I.

Given the current posture of this mental health case, the court will review briefly its

procedural history.[1]

Griffith filed applications for disability insurance benefits and supplemental security

income on March 10, 2009.  Her claims were denied initially and upon reconsideration.

Griffith thereafter appeared for an administrative hearing before an Administrative Law

---

[1] Detailed facts about Griffith's impairments and her medical and procedural history can be found in the report
and recommendation (Dkt. # 18) and in the voluminous administrative transcript (Dkt. # 7).

Judge ("ALJ"). In a decision issued on October 29, 2010, the ALJ found that Griffith had the following severe impairments: obesity, left ear deafness, mood disorder/bipolar with anxiety and depression, personality disorder, and polysubstance abuse in reported five year remission. (Administrative Record, hereinafter "R." 13.) The ALJ determined that Griffith had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, except that she was limited to work that does not require stereoscopic hearing, could not perform production or assembly line work, and was limited to no more than occasional interaction with peers, the public and supervisors. (R. 15-16.) Finding Griffith was able to perform her past relevant work as a dishwasher and housekeeper, the ALJ held that she was not disabled under the Social Security Act. The Appeals Council denied review, and the ALJ's opinion became the Commissioner's final decision.

Griffith filed suit in this court, Case No. 5:11cv00011, and the matter was referred to the Honorable B. Waugh Crigler, United States Magistrate Judge, for report and recommendation. On summary judgment, Griffith raised a single argument—that the ALJ failed to evaluate her mental impairments on a longitudinal basis and chose to highlight only evidence from the record which showed some functioning during periods between Griffith's psychiatric hospitalizations. The magistrate judge agreed with Griffith and, in a report issued on August 17, 2011, recommended the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further consideration. The magistrate judge specifically took issue with the ALJ's consideration of Griffith's four hospitalizations and letters from several lay witnesses concerning Griffith's ability to function. Case No. 5:11cv00011, Dkt. # 16, at 4-6. There were no objections filed to the report and recommendation, and the court adopted the report in its entirety and remanded the case.

On remand, the Appeals Council vacated the ALJ's October 2010 decision and the ALJ held another administrative hearing at which Griffith testified, along with her friend Joan St. John, as well as a vocational expert. On January 25, 2013, the ALJ issued a second opinion in which he specifically addressed the concerns raised by Judge Crigler in his report and recommendation. The ALJ determined that Griffith has essentially the same severe impairments he found previously[2] and has the RFC to perform work at all exertional levels but with certain nonexertional limitations. As he did in 2010, the ALJ limited Griffith to work that does not require stereoscopic hearing, held that she cannot perform production or assembly line work, and limited her to no more than occasional interaction with peers, the public and supervisors. However, he further limited her to simple, routine tasks involving no independent decision-making. (R. 528.) Finding Griffith can perform her past relevant work as a dishwasher, the ALJ once again determined she is not disabled. (R. 535.) The Appeals Council denied review and this appeal followed.

Judge Crigler having since retired, the instant case was referred to the Honorable James G. Welsh, United States Magistrate Judge, for findings of fact and a recommended disposition. Griffith raised the same argument on summary judgment that she raised previously—that the ALJ failed to evaluate the evidence in a longitudinal fashion. Griffith asserts the ALJ, on remand, "simply re-packag[ed] his original decision; the vast majority of which is simply cut-and-pasted from the previous decision. Where he does attempt to address the issues raised by the Court, his rationale is sorely lacking in evidentiary, support, logic or appropriate legal guidelines." Pl.'s Summ. J. Br., Dkt. # 13, at 8. Judge Welsh disagreed, holding "the record before the court more than amply demonstrates the ALJ's

---

[2] The ALJ determined in his 2013 opinion that Griffith had severe impairments consisting of complete hearing loss in the left ear, mood disorder/bipolar disorder, personality disorder with anxiety and depression, and polysubstance abuse in reported seven year remission. (R. 526.)

3

thorough review and examination of all of the available evidence as required by the regulations, including the objective medical evidence, the diagnoses and expert medical opinions, and the subjective evidence of the plaintiff and her lay-witnesses." Report & Recommendation, Dkt. # 18, at 12. He therefore recommends that the court affirm the Commissioner's decision. Griffith filed timely objections to Judge Welsh's report and recommendation, which are now before the court.

## II.

Rule 72(b) of the Federal Rules of Civil Procedure permits a party to "serve and file specific, written objections" to a magistrate judge's proposed findings and recommendations within fourteen days of being served with a copy of the report. See also 28 U.S.C. § 636(b)(1). The Fourth Circuit has held that an objecting party must do so "with sufficient specificity so as reasonably to alert the district court of the true ground for the objection." United States v. Midgette, 478 F.3d 616, 622 (4th Cir.), cert denied, 127 S. Ct. 3032 (2007).

> To conclude otherwise would defeat the purpose of requiring objections. We would be permitting a party to appeal any issue that was before the magistrate judge, regardless of the nature and scope of objections made to the magistrate judge's report. Either the district court would then have to review every issue in the magistrate judge's proposed findings and recommendations or courts of appeals would be required to review issues that the district court never considered. In either case, judicial resources would be wasted and the district court's effectiveness based on help from magistrate judges would be undermined.

Id. The district court must determine de novo any portion of the magistrate judge's report and recommendation to which a proper objection has been made. "The district court may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); accord 28 U.S.C. § 636(b)(1).

If, however, a party "'makes general or conclusory objections that do not direct the court to a specific error in the magistrate judge's proposed findings and recommendations,'" de novo review is not required. Diprospero v. Colvin, No. 5:13-cv-00088-FDW-DSC, 2014 WL 1669806, at *1 (W.D.N.C. Apr. 28, 2014) (quoting Howard Yellow Cabs, Inc. v. United States, 987 F. Supp. 469, 474 (W.D.N.C. 1997) (quoting Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982))). "The court will not consider those objections by the plaintiff that are merely conclusory or attempt to object to the entirety of the Report, without focusing the court's attention on specific errors therein." Camper v. Comm'r of Soc. Sec., No. 4:08cv69, 2009 WL 9044111, at *2 (E.D. Va. May 6, 2009), aff'd, 373 F. App'x 346 (4th Cir.), cert. denied, 131 S. Ct. 610 (2010); see Midgette, 478 F.3d at 621 ("Section 636(b)(1) does not countenance a form of generalized objection to cover all issues addressed by the magistrate judge; it contemplates that a party's objection to a magistrate judge's report be specific and particularized, as the statute directs the district court to review only '*those portions* of the report or *specified* proposed findings or recommendations *to which objection is made*.'"). Such general objections "have the same effect as a failure to object, or as a waiver of such objection." Moon v. BWX Technologies, 742 F. Supp. 2d 827, 829 (W.D. Va. 2010), aff'd, 498 F. App'x 268 (4th Cir. 2012); see also Thomas v. Arn, 474 U.S. 140, 154 (1985) ("[T]he statute does not require the judge to review an issue de novo if no objections are filed.").

Additionally, objections that simply reiterate arguments raised before the magistrate judge are considered to be general objections to the entirety of the report and recommendation. See Veney v. Astrue, 539 F. Supp. 2d 841, 844-45 (W.D. Va. 2008). As the court noted in Veney:

> Allowing a litigant to obtain de novo review of her entire case by merely reformatting an earlier brief as an objection "mak[es] the initial reference to the magistrate useless. The functions of the district court are effectively duplicated as

5

> both the magistrate and the district court perform identical
> tasks. This duplication of time and effort wastes judicial
> resources rather than saving them, and runs contrary to the
> purposes of the Magistrates Act." Howard [v. Sec'y of Health
> & Human Servs.], 932 F.2d [505,] [] 509 [(6th Cir. 1991)].

539 F. Supp. 2d at 846. A plaintiff who reiterates her previously-raised arguments will not

be given "the second bite at the apple she seeks;" instead, her re-filed brief will be treated as

a general objection, which has the same effect as would a failure to object. Id.

## III.

Griffith raises what can only be described as a general objection to the magistrate

judge's report. Griffith acknowledges her failure to specifically object, citing what she

describes as a "lack of depth" in the magistrate judge's report and recommendation and

asserting it "makes it somewhat difficult [for her] to formulate specific or detailed

Objections." Pl.'s Obj., Dkt. # 19, at 1. She claims the report and recommendation "offers

no real rationale or discussion of why Ms. Griffith's allegations of error are wrong." Griffith

points, by way of example, to the magistrate judge's conclusion that the ALJ appropriately

considered the lay-witness statements contained in the record, arguing the magistrate judge

"commits the very same error as the ALJ" with respect to this evidence. Id. at 2. Aside

from her specific reference to the lay witness statements, Griffith does not objection to any

other of the magistrate judge's findings. Instead, she incorporates the arguments raised in

her summary judgment briefs and argues simply that "Ms. Griffith's other contentions as to

error were similarly swept aside by the R&R without any real attempt to address the specific

and detailed arguments set forth in her pleadings." Id. at 5. This argument is essentially the

same one she has advanced now twice previously—that the record evidence has not be given

appropriate consideration. It is plain to the court that Griffith fundamentally disagrees with

the disability decision reached by the ALJ and the manner in which the ALJ considered the evidence in this case.

At this stage of the proceedings, the court is charged with reviewing, de novo, those portions of the report and recommendation to which Griffith has specifically objected. But, as noted previously, Griffith's objection is, on the whole, a general one. Nevertheless, given the nature of the argument raised by Griffith, the court has carefully reviewed the entirety of the record evidence in this case and concludes that the Commissioner's decision is supported by substantial evidence.

## IV.

It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet her burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). To that end, the court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401; Laws, 368 F.2d at 642. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

Mindful of this standard of review, the court turns to Griffith's objections.

## A.

Griffith asserts that the magistrate judge's report and recommendation lacks depth or otherwise fails to adequately address the arguments Griffith raised on summary judgment. The court disagrees. As stated supra, the role of this court on judicial review is to "uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001)) (emphasis in original). Griffith raised only one argument on appeal – that the ALJ failed, once again, to assess evidence of her mental impairments in a longitudinal fashion. In his report, Judge Welsh outlined, in detail, the procedural history of this case, including the primary issue to be addressed on remand, as well as the appropriate standard of review and a summary of Griffith's mental health treatment history, the opinion evidence, the vocational evidence, and the lay witness statements found in the record. Citing to specific pages of the ALJ's decision and certain objective medical findings, the magistrate judge more than adequately explained his reasons for finding that the ALJ properly examined all of the available evidence in accordance with the regulations.

## B.

Moreover, the ALJ did not, as Griffith contends, simply "re-package[ ] his prior decision, committing the same errors, as were alleged in the prior action." Pl.'s Summ. J. Br., Dkt. # 13, at 1. Rather, the ALJ set forth his reasoning in a fifteen page, single-spaced opinion in which he thoroughly examined all of the record evidence. Any previous failure to evaluate Griffith's mental impairments on a longitudinal basis was remedied by the ALJ in his 2013 opinion.

8

Much of the evidence before the ALJ was the same as was before him in 2010—and, of course, the five-step sequential evaluation process[3] had not changed—so there are indeed portions of the ALJ's 2010 opinion which were "cut-and-pasted" into his 2013 opinion, as Griffith points out on brief. Pl.'s Summ. J. Br., Dkt. # 13, at 8. But this does not amount to a failure by the ALJ to take a longitudinal look at the record evidence. In fact, just the opposite is true. In his 2013 decision, the ALJ included a much more in-depth discussion of Griffith's treatment history, before during and after her 2009 hospitalizations.[4] The ALJ stated:

> The objective medical evidence reflects that while the claimant suffers multiple impairments, her ability to function is not limited to the degree alleged. In seeking to properly address the primary concern on appeal, the need for true consideration of the claimant's longitudinal record of treatment, the undersigned specifically discussed the evidence cited by the U.S. Magistrate Judge, including a more in-depth description of 2009 hospitalization admission reports and written statements offered by friends. However, perhaps more importantly, the undersigned will take greater care here to provide a more comprehensive characterization of the evidence specifically discussed above, as well as evidence more generally referenced by citation.

(R. 533.) The ALJ goes on to describe how Griffith's treatment, on the whole, consisted of regular outpatient visits at which mental status examinations were unremarkable. (R. 534.) With respect to her four hospitalizations in 2009, the ALJ explained that these admissions were "surrounded by treatment indicative of only moderate symptoms and limitations" and "are not reflective of the typical degree of symptoms and limitations experienced, as

---

[3] See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).
[4] The court notes that this more in-depth look at the record evidence led the ALJ to change several of his findings in 2013. For instance, in determining whether Griffith's impairments met the severity of a listed impairment in 2010, he found Griffith had mild restriction in activities of daily living and no episodes of decompensation. In 2013, he found she had moderate restriction in activities of daily living and one or two episodes of decompensation of extended duration. Additionally, in his 2013 RFC determination, the ALJ included an additional limitation, finding Griffith is limited to performing simple, routine tasks involving no independent decision-making.

9

evidenced by the above-referenced outpatient records." (R. 534.) The ALJ found that "while the claimant, by her representative, contends that it is the fluctuating nature of her symptoms that is disabling, these hospitalizations are the only significant exacerbations given in the record, with none after November 2009." (R. 534.)[5] Having carefully reviewed all of the record evidence in this case, the court finds there is substantial evidence to support the ALJ's decision.

## 1.

Griffith is a recovering alcoholic with a troubled past. She lost her mother in November 2008, and her subsequent treatment history reveals "lots of bereavement issues." (R. 773.) After her mother died, Griffith was referred by Hospice to Northwestern Community Services ("NWCS"), where she treated with Dr. Meyer and, later, with Dr. Wake, from March 2009 through November 2012. Outpatient treatment at NWCS consisted primarily of medication management for her mood disorder. She usually saw the doctor every month and received additional nursing services. Over the course of her treatment with NWCS, Griffith generally exhibited moderate symptoms, with GAF scores ranging from 55 to 60.[6] Mental status examinations were within normal limits. A typical mental status examination described Griffith as:

---

[5] Here, the ALJ addresses one of the concerns raised by Judge Crigler necessitating remand in Case No. 5:11cv00011. Judge Crigler criticized the ALJ's 2010 decision for "cit[ing] to instances where plaintiff's mental impairments showed improvement," out of the full context of Griffith's longitudinal treatment history, specifically noting her four hospitalizations in 2009. Case No. 5:11cv00011, Dkt. # 16, at 4.

[6] The Global Assessment of Functioning, or GAF, scale ranges from 0 to 100 and considers psychological, social and occupational functioning on a hypothetical continuum of mental health illness. Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text Rev. 2000) (hereinafter "DSM–IV–TR"). A GAF of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Id. In her summary judgment brief, Griffith suggests that these GAF scores may not be a fair reading of her functional capacity, asserting the American Psychiatric Association actually discontinued use of GAF scores recently. Pl.'s Summ. J. Br., Dkt. # 13, at 15. To be sure, a GAF score only represents a snapshot in time and is therefore not essential to the ALJ's determination of a claimant's residual functional capacity. See Paris v. Colvin, No. 7:12-cv-00596, 2014 WL 534057, at *6 (W.D. Va. Feb. 10, 2014). However, the fact that the NWCS treatment records reflect a series of GAF scores in the 55 to 60 range over the course of

> [P]leasant and cooperative. She was appropriately attired and
> both grooming and hygiene appeared good. Speech was clear
> with normal rate and volume. Eye contact and interest in the
> interview were good. She described her mood as "good."
> Affect showed generally good range. There was no evidence
> of psychomotor agitation or retardation noted. No evidence
> of abnormal motor movements. She was alert and oriented
> times three. Memory appeared grossly intact. She denied
> hallucinations. There was no evidence of delusions or of a
> formal thought disorder. She denied suicidal or homicidal
> ideation or plan.

(R. 491-92.) Throughout the relevant period, Griffith engaged in various forms of

counseling and therapy. Records reveal she remained very active in and committed to her

Alcoholics Anonymous ("AA") program and additionally attended meetings through Al-

Anon and National Alliance on Mental Illness ("NAMI").

**2.**

Griffith was hospitalized, briefly, four times in 2009. On March 10, 2009, Griffith

told her treating family nurse practitioner, Hugh LaBree, that she was having suicidal

thoughts and wanted to go to the hospital. (R. 403.) His notes state he had "not seen this

[patient] this depressed since she has been a [patient] here." (R. 404.) That same day,

Griffith was admitted to the Winchester Medical Center and diagnosed with "[d]epression

severe with psychoses[,] rule out bipolar disorder, mixed. Bereavement." (R. 316.) At

discharge, three days later, her diagnosis was "1. Bipolar 2 disorder, mixed without

psychosis. 2. Bereavement." (R. 318.) Her GAF score was 57, up from 22[7] on admission,

and she was noted to have "responded quite well" to medication and therapy. (R. 318.) On

March 16, 2009, she presented to Dr. Meyer at NWCS and described her mood as "better,"

---

several years lends weight to the ALJ's determination that Griffith has generally exhibited only moderate
symptoms, with the exception of the periods of exacerbation leading to her brief hospitalizations in 2009.
[7] A GAF of 21-30 indicates behavior is considerably influenced by delusions or hallucinations or serious
impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal
preoccupation) or inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).
DSM–IV–TR, supra, at 34.

stating she was feeling more "calmed down" and was doing better on her medications. (R. 349.) Her mental status examination was normal, and she was diagnosed with mood disorder, not otherwise specified, rule out bipolar disorder, bereavement, and alcohol and polysubstance dependence in full remission. (R. 350.) Her GAF at that point was 50.[8]

On April 19, 2009, Griffith again presented to the Winchester Medical Center, stating she had a disagreement with her boyfriend about whether or not to go on disability and that she was sad that Mother's Day was coming up, in light of her mother's passing five months prior. (R. 293.) She said she had suicidal thoughts and that she felt overwhelmed and had no motivation. Griffith was admitted and discharged three days later after receiving "significant therapy." (R. 298.) Notes reveal she took a leadership position and mentored peers in group sessions, that helping others seemed to make her feel better, and that she "felt more motivated to get a job and verbalized indeed when she is being more productive, she is happier." (R. 298.) She was diagnosed with "1. Bipolar 1 disorder, depressed. 2. Bereavement. 3. Alcohol dependence in remission." (R. 297.)

Griffith saw Dr. Meyer on April 30th, describing her mood as "good," her sleep as "not good," and her energy level as "a lot better than last time I was here." (R. 353.) She reported having been hospitalized recently and having difficulty dealing with grief in anticipation of Mother's Day, as well as struggling with relationship and financial issues. Her GAF was assessed at 55. (R. 354.) Less than a week later, on May 5, 2009, she presented to the Winchester Medical Center, stating her depression had been getting worse, that she was not bathing, not cleaning and not getting out of bed. (R. 291.) She was not admitted to the hospital. Rather, her Zoloft dosage was increased to 150 mg per day, and she was told to

---

[8] A GAF of 41 to 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM–IV–TR, supra, at 34.

follow up with NWCS. She did so on May 7th, reporting that she "wasn't doing too hot" the day she went to the emergency room. (R. 356.) She noted some improvement with the increase in Zoloft, but stated she was shaky, had been waking in the night, had a decreased energy level, and her appetite was fluctuating. (R. 356.) Her GAF was again 55. Dr. Meyer adjusted her medications and discussed therapy with her. (R. 357-58.)

In June 2009, Griffith reported she was "doing good," and that she was attending therapy and found it to be beneficial. (R. 368.) She said her appetite and sleep were good, but that her energy was still down. (R. 369.) She continued to do well and maintain a GAF of 60 - 65[9] through the summer (R. 374-76, 378, 379-81, 384-85), even stating in August that "her medications had been a miracle for her. She never knew she could be this kind of person and happy." (R. 382.) In mid-September 2009, however, she described her mood as "not too hot," relating this to several upcoming anniversary periods including the anniversary of her mother's death. (R. 757.) She reported trouble sleeping and a decreased energy level. Her GAF was assessed at 60. (R. 758.) On September 30, 2009, she described her mood as "good," noted she was sleeping well and had a good appetite, but that her energy level was "not where I think it should be." (R. 755.) Her GAF was again 60. (R. 756.)

Griffith saw Dr. Meyer again on November 4, 2009, and reported her mood remained "good," that she was sleeping better, and had no problems with appetite or energy. (R. 753.) Nine days later, however, she was admitted to Winchester Medical Center after

---

[9] A GAF of 61 to 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. DSM–IV–TR, supra, at 34. As the record contains several treatment records during this time period assessing Griffith's GAF at 65, the court notes that the ALJ did not err in stating her "GAFs remained in the mild to moderate range" (R. 534), notwithstanding Griffith's assertions to the contrary. See Pl.'s Summ. J. Br., Dkt. # 13, at 15 ("At no point was the ALJ correct to minimize Ms. Griffith's functioning by characterizing it as 'mild.'").

13

stating she "did not feel safe outside the hospital. The 1st year anniversary of her mother's death is coming up and the patient states that she has no 1 to talk to." (R. 464.) She was discharged after three days. It was noted "[t]he patient has been in previously and usually comes in for a respite time of approximately 3 days and then when she feels like she has had the support, she feels safe again to go home and this was the case here." (R. 469.) Upon discharge, her GAF was 55, up from 20[10] on admission.

She presented to Dr. Meyer one week later, on November 23, 2009, stating she was "not all right," and was depressed secondary to the anniversary of her mother's death on November 18th and her mother's birthday on November 22nd. (R. 488.) As for her recent hospitalization, she stated she "just wanted to get away from things." (R. 488.) Her mental examination was normal and her GAF was 55. (R. 489.) That evening, however, she was hospitalized at the Winchester Medical Center after overdosing on her medication. She reported leaving NWCS that day feeling suicidal: "The patient stated she felt like she had nowhere to go and did not feel at this time that her boyfriend was supporting her. He states that he feels at times that she is putting on a show." (R. 436.) Notes reveal Griffith "did mention the fact that she was told that these recent current hospitalizations will aid in her expedition of the disability process." (R. 439.) Griffith was discharged from the hospital four days later. Discharge records state:

> One her 1st day of admission, the patient was wanting to leave, which had been her usual pattern. Once she gets into the hospital, she feels supported and safe and feels ready to go. She was disheveled in appearance. However, after her 1st 24 hours, the patient had showered and had groomed herself. She had multiple visitors, which gave her support

---

[10] A GAF of 20 indicates some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely coherently or mute). DSM–IV–TR, supra, at 34.

Case 5:13-cv-00090-MFU-JGW   Document 22   Filed 03/16/15   Page 14 of 21   Pageid#: 997

and made her feel better, that she was not also alone. She became more sociable. Her tangentiality had improved. She did not feel suicidal or homicidal, however, she continued to have morbid thinking. The patient responds very well to supportive therapy and a cognitive type of therapy with insight. Once her emotions are calmed down, her insight significantly improves. The patient attended groups. She is very invested in doing what she can do to help herself. With the medication changes and lots of supportive therapy, the patient's ego strength improved. She felt more able to cope and handle things. She no longer had any suicidal thoughts. No morbid thinking and again, was looking towards the future. Thus, it was decided to discharge the patient on 11/27/09.

(R. 442.)

At her appointment with Dr. Meyer on December 8, 2009, she said her mood was "all right," that her sleep, appetite and energy level were all good, and that the Seroquel added to her prescription regimen at the hospital was helping. (R. 485.) At that time, Dr. Meyer assessed her GAF at 55. (R. 486.) Griffith continued to report feeling "good" or "all right" and exhibited moderate symptoms throughout most of 2010.[11] (R. 491-92, 503-04, 505-06, 507-08, 509-10, 511-12, 742-43, 744-45.) During this time period, Griffith received counseling services through the Laurel Center. (R. 818, 820, 821.) Around the holidays, Griffith stated she was "starting to get depressed." (R. 740.) But at her appointment on January 14, 2011, she stated she was doing "okay" and her energy had been fairly good. (R. 738.) She began therapy with Crossroads Counseling (R. 700) and in February attributed her "fluctuating" mood to seeing a new therapist. (R. 736.) Nevertheless, she said that therapy

---

[11] In March 2010, Griffith reported feeling depressed and said it had been "a struggle to get up" for the past few weeks. (R. 514.) She wondered whether there may be a seasonal component to how she was feeling and stated she had been less active. In May she reported trying to be more active during the day (R. 509), and at her next appointment in June she described her energy as "a little bit better," and had started to walk for exercise. (R. 507.) Later, in August, records reveal she was seen at the Warren Clinic on an emergency basis, after step 8 of her AA program "brought up a great deal of turmoil" and she felt "getting in touch with '[her] inner child' had triggered her torment." (R. 746.) In September, she reported to Dr. Meyer feeling somewhat depressed and having no energy. (R. 744.) She attributed this to starting therapy and "dealing with many things from her past." (R. 744.) Her medications were adjusted and at her next appointment in October, she stated her energy level was "a lot better." (R. 742.)

15

was helping (R. 729) and records from Crossroads state she made "significant progress." (R. 700-05.) NWCS records reveal Griffith continued to exhibit moderate symptoms throughout 2011. (R. 721-22, 723-24, 725-26, 727-28, 729-30, 732-34.) She reported increased energy after she began taking medication for her menopausal symptoms (R. 725) and said she was getting out more (R. 721) and walking for exercise (R. 716, 718).

She, again, continued to do fairly well and exhibit moderate symptoms into 2012. (R. 706-07, 708-09, 711-12, 713-15.) She attended group counseling and found it to be helpful. (R. 711.) In early June she reported feeling depressed and not feeling like getting out of bed (R. 706), and at an appointment the following week, it became clear that she had nôt been taking her medication as directed and had made changes to the prescribed dosage on her own prior to her last visit. (R. 814-15.) In July, she stated her mood was good, and her sleep, appetite and energy had all been good. (R. 811.) She continued to report doing well in August and September. (R. 805, 806-07.) In September, however, she requested "another doctor and another attorney." (R. 805.) She reported "[s]he has applied for disability, but has been turned down. She stated that she would like another doctor who would help her get in touch with her 'feelings.'" (R. 805.) Dr. Meyer explained to Griffith the role of a psychiatrist versus that of a therapist. Dr. Meyer's treatment note concludes: "Upon further discussion, it became clear that Ms. Griffith's request concerned her not having receiv[ed] disability rather than the [ ] need for more psychotherapy from a psychiatrist." (R. 805.)

In October, she began treating with Dr. Wake at NWCS, who noted that her "appearance, mood and speech pattern are calm today. There are no hallucinations, delusions or intrusive thoughts reported. Memory is grossly intact. Judgment and insight are not impaired. Patient is oriented as to time, place and person and seems to have average intelligence. No suicidal or homicidal ideas or plans." (R. 832-33.) Dr. Wake assessed

16

Griffith's GAF at 58. (R. 833.) Treatment notes from Dr. Wake in November state that Griffith "seems to be getting along quite well." Additionally, Griffith "seems to have good daily activities and be feeling overall pretty well." (R. 830.) Her GAF was 60. (R. 831.)

### 3.

Plainly, the record evidence supports the ALJ's conclusion that the four hospitalizations in 2009 "are not reflective of the typical degree of symptoms and limitations" generally experienced by Griffith. (R. 534.) Indeed, the treatment records surrounding these hospitalizations reveal only moderate symptoms, and those moderate symptoms continued well after her last psychiatric admission in November 2009 into 2012.

Notably, there is no opinion evidence from any of Griffith's treating providers[12] stating that she does not have the functional capacity to work. Indeed, the only opinion evidence in the record is from the consultative examiner and the state agency reviewing physicians. Consultative examiner Paul M. Hill, Psy. D., opined on February 16, 2012 that Griffith has mild limitations in her ability to understand and remember simple instructions, moderate limitations in her ability to carry out simple instructions, mild limitations in her ability to make judgments on simple work-related decisions, and marked limitations in areas involving complex instructions and decision-making. (R. 697.) Dr. Hill further found that she has moderate limitations in her ability to interact appropriately with the public, supervisors and co-workers, and in her ability to respond appropriately to usual work situations and changes in a routine work setting. (R. 698.) He further noted there is a strong possibility Griffith has a learning disability or below average intellectual ability and general difficulty with comprehension. (R. 697-98.) The ALJ gave significant weight to this opinion,

---

[12] There is a notation in an April 2009 record from family nurse practitioner Hugh LaBree that states "I recommended that pt file for disability because of depression and needing to see mental health on a reg basis." (R. 401.) However, there is no opinion from a treating provider as to her functional capacity.

17

save for Dr. Hill's finding that Griffith has moderate limitations in the ability to carry out simple instructions, because the record evidence showed her memory and concentration were normal. (R. 534-35.) He also gave significant weight to the findings of the reviewing state agency physicians, who found that Griffith was not significantly limited in her ability to understand, remember and carry out simple instructions, to maintain regular attendance and make simple work-related decisions, among other things, and was moderately limited in her social interactions. (See R. 76-79, 87-90, 100-02, 110-12.)

On this record, the court finds the ALJ's 2013 decision to be supported by substantial evidence.

## C.

Griffith directs the court's attention specifically to the lay witness statements in the record. In her objections to the report and recommendation, she argues the court's "feelings about the serious import and relevance" of these statements in her 2011 case, see Case. No. 5:11cv00011, Dkt. # 16, at 6, was "virtually one-hundred and eighty degrees from how the ALJ has now, again, treated them on remand and as viewed in the current R&R. . . ." Pl.'s Obj., Dkt. # 19, at 2.

The record contains four witness statements. Joanie Newton wrote a letter on September 10, 2010 recounting how she met Griffith three years ago at an AA meeting and describing Griffith as tearful and "struggling with emotional issues which she could not explain." (R. 270.) Ms. Newton noted Griffith displayed some of the "same behavioral issues that have occurred in [her] life," such as becoming "increasingly unable to carry out simple tasks, such as housecleaning, bathing, talking on the phone, and get out of bed." (R. 270.) Marsha Poe, a manager at Griffith's former place of employment, described in a short statement how Griffith was a coffee hostess but "was not very approachable" and the job,

18

which involved customer service and "multiple tasks," was too much for her: "She needed a much slower pace. So we agreed it would be better to let her go." (R. 272.) Susan Hambleton, a long-time friend of Griffith, stated Griffith is anxious and nervous, loses her train of thought, makes mistakes more than once "because the attention span is not there," and cannot cope well when there are "[t]oo many things going on at one time." (R. 273.) Ms. Hambleton further stated that Griffith is "always in bed. As if she has no energy or desire to meet the world." (R. 273.) Mark Snyder, referred to at various points in the record as Griffith's boyfriend and co-resident, wrote a statement on September 8, 2010, describing Griffith's childhood, her difficulty managing a checkbook and paying bills, her struggle to obtain her GED, her forgetfulness and her ability to do only one thing at a time. (R. 688-91.) He further described that around the time her mother died, "[s]omething was going on with Donna. She didn't want to do anything. Go anywhere. [F]ix something to eat. Nothing." (R. 691.) He stated she went to the hospital where she was diagnosed as manic-depressed and bi-polar. (R. 691.)

Judge Crigler did specifically reference these lay witness statements in the report and recommendation he issued in Griffith's 2011 case. In that report, he found that the ALJ failed to parse the evidence in its full context, citing Griffith's 2009 hospitalizations and these letters, which he stated "provide further insight into her mental impairments." Case No. 5:11cv00011, Dkt. # 16, at 6. With respect to these witness statements, Judge Crigler held that the ALJ failed to give them appropriate attention in his 2010 opinion. Judge Crigler found these statements as to the limiting effects of Griffith's impairments to be consistent with the other evidence of record before him at that time. As such, he remanded the case for further consideration.

19

At the court's direction, the ALJ paid particular attention to these lay witness statements on remand (in contrast to his 2010 decision, in which he paid almost no attention to them). Indeed, he factored these statements into his credibility determination in his 2013 decision, stating:

> The written statements and testimony by the claimant's friends (Exhibits 11E-13E and 18E) have been fully considered and are given little probative weight due to the sources' lack of medical or psychological objectivity and expertise. Certainly, ongoing outpatient treatment records do not substantiate witness statements that the claimant remains in bed at such a high frequency; nor do Mr. Snyder's statements, for that matter. However, the themes of focusing on one thing at [a] time, as aptly stated by longtime co-resident, Mr. Snyder, as well as a degree of social difficulty, have been factored into the claimant's residual functional capacity.

(R. 535.)

In assessing a claimant's credibility, the ALJ is charged with considering the entire case record, including lay witness statements about the claimant's symptoms and how they affect the individual. Social Security Ruling 96-7p; see also 20 C.F.R. §§ 404.1513(d), 416.913(d) ("In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work."). In this case, the ALJ discharged that duty in his 2013 decision, which is the decision currently before the court for judicial review. In so doing, he properly determined that the degree of severe limitation described in some of these statements – i.e., that Griffith is unable to get out of bed – is not substantiated by the outpatient treatment records or even by Mr. Snyder's statements. However, certain themes that run through the witness statements and are also borne out in the treatment records, such as her ability to focus on only one thing at a time and her degree of social

difficulty, were factored into the ALJ's RFC assessment. (R. 535.) The court finds no error in the manner in which the ALJ considered this lay witness evidence.

**V.**

A different factfinder may have reached another conclusion in this case. The court, however, is mindful of its limited role in reviewing social security disability appeals. It is not the province of a federal court to make administrative disability decisions. Rather, judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to meet her burden of proving disability. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). In so doing, the court must not "re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992).

Having carefully reviewed the record evidence in this case, the court finds that substantial evidence supports the ALJ's decision. As such, the court holds that the magistrate judge's report and recommendation should be adopted in its entirety.

An appropriate Order will be entered to that effect.

Entered: 03— 16-15

/s/ Michael F. Urbanski

Michael F. Urbanski
United States District Judge

21
